All right, we'll call the next case. It is Crowson v. Washington County, Utah. In this case, we've allotted 20 minutes per side. And with that, counsel, you may proceed. Thank you, Your Honor. Can you hear me okay? Yes. All right. I represent Nurse Johnson as well as Washington County. I plan to take 10 minutes and reserve three minutes for rebuttal, reserving the rest of the time for Dr. LaRoe's argument. This is a case where Mr. Crowson was diagnosed at a hospital on July 1st of 2014 with toxic metabolic encephalopathy. Now, he never, he had the first symptom that he might have had regarding that was on June 25th of 2014. At least he started displaying some symptoms of withdrawal on that date. There's no evidence in the record that there was any symptoms prior to that. And it was a deputy, Brent Lyman, who discovered that when he was in the punitive isolation section of the jail. That person was a defendant. The plaintiffs voluntarily dismissed Mr. Lyman. So there's no evidence that Mr. Johnson heard about any symptoms whatsoever prior to June 25th. There's two windows here that the district court based upon her findings gives to show liability for Mr. Johnson and Washington County. First, on the June 25th, she claims, excuse me, the district court claims that he didn't refer him to Dr. LaRoe at that point and he left the jail without follow-up care. First of all, he did refer him to P.A. Wurlton, who's actually a nurse practitioner, but that was another mistake of the lower court. It's a similar medical provider, nonetheless. He is also in charge of mental health, but he's also in charge of the medical administration of the jail. He is there every day of the week. He apparently did not get that and see Mr. or whether he got it or not, we don't know. He said in his deposition, Mr. Wurlton, that he usually would not see somebody if they're still withdrawing from some substance because he couldn't do an accurate mental health assessment. So in any event, didn't P.A. Wurlton testify he never got nurse Johnson's request for a medical evaluation? He did. Absolutely. And I'm going to just honestly say that has nothing to do with Mr. Johnson's liability whatsoever because he did that referral in the medical system and he's not the scheduler. It was also Wurlton's testimony that there was a scheduler and that person is supposed to schedule once it's in the system. So that's no different than... Was it a request for a psychological evaluation, not a medical evaluation? Well, first of all, Wurlton was the administrator for the medical unit also. The entire medical unit, he's in charge, but what he... He wasn't asked in this specific case to render a physical medical opinion. It was a psychological opinion and Dr. LaRue, who would have been the person to do the medical, was not notified, correct? He would have been one person to do the medical, yes. But I will say this, that this is very that he's lethargic, that he's not quite as energetic as he normally is apparently because he's been in the jail before. And three, there's memory loss issues. Now, they even pull in one of the officers who there's no evidence that he ever talked to Johnson about putting the underwear on his head. But in any event, what he has is memory loss, can't remember the job he had before he came to the jail. He had also been to the hospital a couple of weeks before because of heroin overdose issues. So this person has a substance abuse issue. But whatever the fact is, is this is the symptoms. He has lethargy, he's not quite as energetic, and he has some memory loss. It made sense at that point to do a mental health evaluation. And it isn't deliberate indifference for him to make that wrong distinction between Dr. LaRue versus P.A. Whirlton. So that actually completely exonerates him under any of the case law, especially Mata and Sealock. I think that's the one window. They say he left the jail without any follow-up, but what they forget to say is, and this is important because plaintiffs in their brief claim that this is like Mata, like Weldon, Nurse Weldon and Mata, who did absolutely nothing. That's not the case with Mr. Johnson. Mr. Johnson actually moved into medical unit where the unequivocated testimony was he's seen every 30 minutes by officers. He's seen twice a day by the day shift nurse and the evening shift nurse. So that's where he has moved to. He can rely on those policies that was never disputed that that's the policy. He's been gone for two that says a line staff person or a line staff nurse is somehow liable for days that he is not actually at the jail. He comes back to the jail and this is the other fault of the district court fines in Mr. Johnson. They say, well, he didn't tell how long he had been in medical and he didn't tell Dr. LaRue how long he had been on punitive isolation. Those are irrelevant because what he did tell, and it's undisputed, he told about all of the symptoms that he had. And based upon that symptoms, he got some diagnostic testing ordered by Dr. LaRue. Well, Dr. LaRue decided that he didn't need to follow up with the blood testing only that he could only get the benefit of the chest x-ray. And if you're saying it's irrelevant, I was with you until you said that it was irrelevant because it seems quite relevant to say that Dr. LaRue was going to make these diagnostic decisions, including not to follow up with the testing of the blood when he didn't, when he had every reason to think that Mr. Croson was withdrawing from opiates. No, so I didn't say it's irrelevant, first of all, necessarily to Dr. LaRue. I do not represent Dr. LaRue, but I said it is irrelevant because the first symptom he got was on June 25th when he was in that punitive isolation. And the evidence was that there is sometimes substances that they get even in different parts of the jail. So this isn't like some him in other cells. There's exercise time. There's these kinds of things that do happen. And so it's incorrect to make this assumption that's not in the record that he could not be detoxing somehow just because he was on punitive isolation. There's no evidence of that. Did you argue that in your response to the summary judgment or in your summary judgment briefing that he was in punitive isolation, he still could have gotten drugs? Yes, absolutely. And in fact, that was part of the affidavits that people made even homebrew. They would pass things along. Somehow it could have gotten passed. So in any event, this is what's important is that you look at MATA and you look at C-LOC. And in that case, they did not tell the doctor and they did not tell a nurse practitioner that he had chest pains. Now, which is more important, that he gave all the symptoms that he was having, or he didn't tell about his cell assignments? I would say that it's far worse in MATA and C-LOC not to tell that this person has chest pains. And so what we're really equivocating here is a housing assignment is irrelevant because the first symptom was on the 25th of June, and then he was giving those symptoms. He said that he had a complete history. That's what was undisputed. He had a complete history already from him. And so I think that, yes. You're almost nine minutes in. So I want to pivot over to the county. Yes. Great. Maybe it would help us to hear why doesn't our decision last year in Burke versus Regalado support denial of summary judgment to the county here? How would you contrast the two cases? So this is not, and I'm not exactly completely familiar with that case, but this is not a case where there's an unconstitutional policy. It's not a case where they're saying, we're not going to provide medical attention to these types of people or something like that. There's no written policy that says that this, what the district court found was there wasn't a written policy for diagnosis, treatment, and when to send someone to the hospital. Those can't be in policy. They cannot be in policy because we're not a medical facility, the jail. The jail has to rely on professionals. That's exercising professional experience. And they have 24-7 nursing staff. They have a medical administrator there. They have, who's a practitioner. They also have the doctors that they can call for state and county inmates. And so they are getting, are relying as they should for diagnosis and treatment and for sending someone to the hospital is a medical decision. And that was done medically in this case. Interestingly, Mr. Bowerman, they say comes on the 29th, but he doesn't even call until the 30th or actually the 1st. He doesn't even call until the 1st. I see I'm out of my time here. Is there Thank you, your honors. May it please the court. I have the privilege of representing Dr. LaRoe. The appellants will collectively reserve five minutes for rebuttal, giving me five minutes for argument. Let me ask you, Mr. White, the district court said that Dr. LaRoe, quote, refused to assess or diagnose Mr. Crossland's condition at all, close quote. Do we have to accept this fact on interlocutory review? No, your honor, you don't. And the reason you don't is because that finding blatantly disregards the record. As to all three points, the first point that Dr. LaRoe did not assess Mr. Crossland is incorrect. Dr. LaRoe testified that the nursing, the nurses at the jail are his eyes and ears, and they have to be because the way this is set up is Dr. LaRoe is only there one day a week, maybe two days a week. So he can only receive reports that he receives from the nursing staff. So he did very much assess Mr. Crossland through those reports. As to the second part that he did not diagnose Mr. Crossland, that is also blatantly contradicted by the record. Dr. LaRoe testified and it's undisputed that he believed that Mr. Crossland was experiencing withdrawal from some substance, which was causing his symptoms. That's why on June 29th, Dr. LaRoe prescribed medication, Ativan, which it's also undisputed, calmed some of Mr. Crossland's symptoms, making him feel better. So he very much diagnosed Mr. Crossland's condition. He thought it was drug withdrawal. And then as to the last statement made by the district court that he failed to treat Mr. Crossland, that's also incorrect. There were diagnostic studies ordered. At least one of those studies could not be completed as it was reported to Dr. LaRoe because of cooperation problems. Also because of tattooing, excuse me, not tattooing, but scarring on the arms from heroin use. This was reported to Dr. LaRoe. And then of course the other treatment. Well, on that last point, why was Dr. LaRoe deliberately indifferent by failing to follow up with another test? I mean, the nurse says, well, I couldn't do the blood test, but then nothing else happened by way of testing. Yes. And the reason he's not deliberately indifferent as of June 28th, when it's reported to him that this test could not be performed is because he's not confronted at that time with symptoms that appear to him to be a life-threatening condition, a life-threatening condition, or a condition that can cause permanent damage. He's still thinking along the lines of drug withdrawal. If his medical opinion was he needed the test once, what changed to make him no longer need the test results to make a competent diagnosis? Well, what changed was the report to him, your honor, that the test could not be completed because of the excessive scarring and because of Mr. Croson's failure to cooperate. Here he is faced with a patient. He's not at the facility. He's on the phone and it's being reported to him that there's a patient who will not cooperate and that the test cannot be done. So on the 29th, when it's reported to him that these symptoms continue, he moves, based on his diagnosis, what he believes Mr. Croson is facing to drug withdrawal. And because that's what he believed Mr. Croson was facing, he then prescribed the medications. And it's also very important to note, those medications were effective as of the 29th of June. And then Dr. Leroux doesn't hear anything for another few days until July 1st. There's one other conclusion made by the district court that I think is important to talk about here. And that was the district court's finding that Dr. Leroux refused to even visit Mr. Croson at the jail. But that is a very unfair finding to Dr. Leroux because of the schedule at the prison for him to be there. And as we've outlined in the briefing, he was only there once a week. And if we lined up the days, the days don't indicate that he was supposed to be there during the time that these reports are coming to him regarding Mr. Croson. So as to the subjective prong of the deliberate indifference standard, we believe that the district court relied upon visible fiction, blatantly contradicted the record. This is a doctor who, at worst, simply misdiagnosed Mr. Croson. Go ahead. Well, let me ask you in terms of the line between deliberate indifference and negligence. Now, with regard to the lack of cooperation, the summary judgment evidence is that the hospital had testing that they would have been able to conduct without regard to whether he cooperated or not, correct? That is correct, Your Honor. So the only question is about the scarring. So he hears from the nurse that he has scarring and that in combination with this other considerable factor would have prevented her from conducting the test. Now, you say that he was content, he had good reasons not to visit, but there's no evidence about him following up. How extensive is the scarring? Is it such that if we put him in a hospital that they too would be unable to find a vein in order to test the blood? And so when you're saying that, well, he acted reasonably because he was not able to conduct one of the two diagnostic tests that he previously had deemed necessary, the blood testing, and he doesn't yet have the results from the chest X-ray, he prescribes Ativan. And the Ativan, there's a 50% chance it's going to work if he's only experiencing opiate withdrawal. And there's a 50% chance that it's going to totally exacerbate the metabolic encephalopathy that is going to ultimately kill him. And so the plaintiff argues, well, that's not a diagnostic mistake. That's a guess because he's not following up to even see if the hospital can conduct the blood test in order for him to decide whether Ativan is going to help him or kill him. What's wrong with that? Well, I don't think it's a guess, Your Honor. This is a doctor who works at the prison facility. He's very familiar with what takes place there. Drug withdrawal happens all the time. And Mr. Croson's symptoms match what he sees all the time. That's the undisputed testimony. So it's not that in his mind there were these two competing, you know, drug withdrawal or encephalopathy. He was confronted with symptoms he sees all the time and he acted accordingly. And that medication worked. That was the result for Mr. Croson. And then July 1st, everything changes. Your Honor, I believe we need to take the rest of our time for rebuttal. Thank you very much. Thank you. Good morning, Your Honor. Please proceed, counsel. Thank you. Good morning, Your Honor. It's Devi Rao for Appellee Martin Croson. The constable's entire argument is premised on a disagreement with the factual determination made by the district court. This court lacks jurisdiction over this appeal. But if it decides to reach the merits, it should affirm. As this court has articulated many times in the past few years, as recently as a few weeks ago in Quintana, a prison official's deliberate indifference to an inmate's serious medical needs violates the Constitution. This court has applied that rule in Quintana, Mata, Selock, Blackman, and others to determine that the law was clearly established and defendants were not deliberately indifferent. I'm sorry, we're not entitled to against deliberate indifference claims. It should do so here. As to Nurse Johnson, the law makes clear that a gatekeeper that knows of a medical need must escalate to the appropriate medical professional for treatment. As to Dr. Leroux, denying required care that the professional knows is called for is the epitome of deliberate indifference. In a careful opinion after examining all the facts, the district court concluded that a jury could find that Nurse Johnson and Dr. Leroux were actually aware of the need for treatment for Mr. Krausen's serious medical condition and acted with deliberate indifference. Counsel, didn't Nurse Johnson do more than Nurse Weldon did in Mata? I mean, counsel points out that there was the referral to PA Worlton. Why doesn't that show that he was not deliberately indifferent? May not have been the best course action, but it was a course of action. And how can that be deliberate indifference? This court's case law is clear that the there needs to be an inquiry into the manner in which the gate was opened, when the gate was opened, and to whom the gate was opened. It's not the case that a gatekeeper can make one call and pass the buck to someone else. In, in, uh, sorry, sealock, the court explained that delay can lead to gatekeeping liability mean, meaning you assess the manner in which the gatekeeper does their job. And in Mata, it says you must contact the appropriate medical professional. As Judge McHugh pointed out, the referral to Worlton was for psychological care. Yet, yet the district court concluded that jury could find that Nurse Johnson knew, in fact, that Mr. Carson needed medical care. That's at 213. So a referral for psychological care simply is not sufficient to absolve him of the gatekeeping liability. Is a physician's assistant qualified to provide medical care? Yes. And Mr. Worlton was a physician's assistant, right? Um, he was, or I guess I believe Mr. Mylar said that he, there, the district court may have been incorrect as to whether he was a physician's assistant or a registered nurse. But at any rate, I'm sorry. Yes. So he was a physician's assistant. So my question is, so Nurse Johnson says, uh, Mr. Worlton, whether you're, uh, you're qualified to provide medical care, he needs a psychological, uh, evaluation. Well, a psychological evaluation can also, I mean, there are psychiatrists, I mean, that they can, uh, that they treat, can diagnose and treat a psychological condition, not in a vacuum, but also with regard to their medical conditions. So if he said, if Nurse Johnson says conduct a psychological evaluation, why isn't that enough to open the gate for assuming that he was a physician's assistant qualified to provide medical care to do whatever medical care is necessary to evaluate his psychological problem? Nurse Johnson knew, was aware of the need for prompt medical care. And yet, instead of giving some sort of general referral to, um, Worlton or a medical referral to Dr. Leroux, he specifically, uh, referred Mr. Krausen for psychological care. And I'll note, judge that, uh, psychological care is distinct from psychiatry, which is a form of medical care. And, um, there's no question that this was a psychological referral. Um, and that in Johnson's declaration, the district court sites at 2.13, um, he was concerned that Krausen was suffering some medical problem. And in MATA it's clear that you need to contact the appropriate medical personnel. That's what a gatekeeper is responsible for doing. And we frankly, um, the district court concluded that a jury could find that the referral to Worlton isn't sufficient for those purposes. The arguments I heard Mr. Mylar making, um, all sounded in quibbles with the district court's factual determinations, which frankly, this court lacks jurisdiction over on interlocutory appeal. Um, unless, unless the record, uh, clearly contradicts, uh, those findings, correct? The Scott v. Harris exception is exceedingly narrow. It applies. I understand, but there is an exception, correct? Yeah. All right. So let's talk about that exception relative to Dr. Leroux. Um, how, how could the district court conclude that he made no diagnosis whatsoever? And he did, he prescribed some medication, said at his deposition that the symptoms were nonspecific. How can it be an all or nothing proposition? Your Honor, I don't believe the district court was holding, um, Dr. Leroux to any sort of all or nothing, um, standard Dr. Leroux at page nine of his brief. Um, Well, but counsel, uh, the district court said that Dr. Leroux refused to assess or diagnose the condition at all. Um, that does seem a bit all or nothing, doesn't it? The district court concluded that, uh, Dr. Leroux knew that in order to make a diagnosis, what he needed to do was run these blood tests. Dr. Leroux at his page nine of his brief sites, his own testimony at that's a four 27, that he ordered the test on the 28th because of the some clue as to where to go next. He knew that Mr. Carlson was confused and disoriented, gave one word answers to questions, couldn't follow instructions to take a deep breath and had elevated blood pressure. These are symptoms that Dr. Leroux knew that he needed a simple blood test to, um, decide what the appropriate, what to, uh, exclude or include, um, things to make a diagnosis. And he didn't, when it became at all difficult to make that test, he abandoned that, um, abandoned it. And, uh, so he remained with on the 28th, no clue as to how to, um, as to how to make a diagnosis for Mr. Carlson, the district court determined that the jury could find that that amounts to deliberate indifference. And that's not, doesn't fit within the extremely narrow, um, visible fiction, uh, exception in Scott B. Harris. And I'll note, um, there's questions, uh, about scarring. There's, um, no, uh, Dr. Leroux does not contend in his brief that the scarring on the 28th, when he was alerted, alerted to the fact that the test couldn't be Um, and in fact, there's evidence that Dr. Leroux did not even know about the scarring at that time at age 428 and his deposition, he's asked, uh, why the test couldn't be completed. And all he answers is about, um, Mr. Carlson couldn't sit still. And so the scarring played no role on the 28th, um, in his decision to not pursue the blood testing that he knew was the next appropriate step, um, to be able to effectively diagnose Mr. Carlson. Um, can I ask you a question about Dr. Leroux? And, uh, you know, he prescribes Ativan. He doesn't follow up with the blood testing. He does, uh, require an x-ray. How do you, uh, how do you interlay that information with the fact that in Quintana, uh, the majority opinion said that Nurse Robinson did not even commit a constitutional violation because she had prescribed a couple of medications in a, in a kick kit and that that was enough, even though they acknowledged that there were allegations in the complaint that she failed to conduct an adequate intake. She failed to conduct, get, acquire additional information that would have allowed her to make a more meaningful medical assessment, which sounds akin to what you're complaining about Dr. Leroux doing. Your Honor, the issue with, um, in Quintana was about the subjective knowledge of the defendants, um, and the court distinguished between folks who didn't understand that something serious was going on and he needed care versus the person who did. That's exactly what's going on here. Dr. Leroux understood as a medical professional what the next course of treatment was, uh, and that was he needed to conduct these tests to be able to understand he had quote, no clue what was going on with Mr. Croson. And so the district court concluded that a jury could find that in fact, both defendants subjectively understood the need for medical care in this case. And so that additional reason why, um, the law was clearly established here. Um, it's clearly established as this court noted in Quintana that a prison official's deliberate indifference to an inmate's serious medical needs violates the constitution. In Blackman, the court said as early as, or by at least 1997, this was the rule. The reason why, um, qualified immunity is to put defendants on notice. And in certain circumstances, a general rule is relatively straightforward and easy to apply. That general rule is that when a defendant subjectively knows of the need for medical care, they need to act. And the district court concluded that because these defendants knew of the serious medical needs, a jury could find that they acted with deliberate indifference. And that's consistent with the way this court, uh, just last week in the Brown case discussed qualified immunity. It's putting defendants on notice because there's no dispute here about the subjective knowledge, or I'm sorry, but because the district court concluded that a jury could find these defendants had subjective knowledge, therefore, um, is clearly established on Quintana, Mata, Sealock, Blackman, and other cases that these defendants needed to, um, act. The gatekeeper needs to alert the appropriate medical professional. And Dr. Leroux needs to do the one thing that on the he realized in his medical, um, knowledge that it was required for diagnosis and subsequent treatment, and that's the blood test. And then he doesn't follow through on the blood test. And at that moment, the district court found there were tribal issues on deliberate indifference. I heard opposing counsel make a lot of arguments about why perhaps they didn't actually subjectively know, or why their, um, actions, um, means that they were at most negligent. And they're free to argue that before the jury, but the district court, in a very thorough opinion, looked at all of the facts and said that there, there were tribal issues on, um, these, uh, on these questions. And, and frankly, the appeals as framed up by appellants are complete disputes of, uh, with the district court's factual conclusions. They don't fit into the narrow exception in Scott v. Harris. And it is, um, it behooves this court to keep that exception exceedingly narrow, because if this court allows for a de novo review of the facts on qualified immunity, it will mean that the exception follows the role that every, um, inter, I mean, so-called interlocutory appeal from a qualified immunity denial becomes, in fact, a re-reviewing of the district court's conclusion. And that's- Counsel, counsel, could I just, um, ask you to focus on the distinction between, uh, the prong one and prong two steps for qualified immunity here? You, you, you've mentioned, um, in the last minute or two, a couple of times that the district court, uh, concluded that a reasonable jury could find deliberate indifference. And I think that speaks to prong one, but as you know, the clearly established law part of qualified immunity, um, Supreme Court has, has, uh, has said, you need to have an on point or a, or at least a factually analogous case. And in the deliberate indifference context that we have here, it seems like you're stating a pretty clear case. And I'm not sure you're wanting to put it that way and I don't want to put words in your mouth, but could you speak more specifically to clearly established law? And what is your best case, your best case for this case? Sure. So, um, uh, I'll take the abstract question first and then, uh, answer the best case, uh, So just last week in Brown, the court explained that, um, finding the law clearly established depends on the circumstances of the case. In that case, um, the defendant, uh, said, how was I to know that, um, my actions or that the context here meant that there was no such, no consent for sex between an inmate and a prison guard. And the court said, no, you don't need a case to tell you that the law was clearly established when there's no consent. Um, there that's a constitutional violation. And the reason is it's cited on the Supreme Court's decision in Mullenix where there are certain circumstances, such as the excessive force context, whether it's a hazy border between excessive and permissible force. And you perhaps in that circumstance want a case that is factually analogous, but it said in other circumstances, like the equal protection context, it cited one of the court's precedents there. And like, um, the, uh, sexual consent case, uh, situation before the court in Brown, you don't need necessarily a case to tell you this isn't okay because the general rule is relatively straightforward and easy to apply. And that's the way this court in Quintana, Mata, Seelock, and Blackman has articulated the, that the law is clearly established, um, just at the level of generality of, um, when a prison official is deliberate, acts deliberately and differently. I take your point judge that, um, that, you know, you're asking for our best case. I'll say for, um, Dr. Leroux, Mata says that a, um, uh, uh, who completely refuses to diagnose a medical condition is deliberately indifferent and self, um, provides that when a medical professional knows that medical protocol requires minimal diagnostic testing to confirm the symptoms, but does nothing that person can be deliberately indifferent. And, uh, those cases both speak to the situation that Dr. Leroux found himself in. He knew that he needed testing to understand what was going on with Mr. Krausen and then abandoned that testing when it became at all difficult to complete. As to the gatekeeper, nurse Johnson, um, this, uh, court in Mata said that the gatekeeper must contact the appropriate medical professional who is capable of treating the condition. And, um, in Blackman, which was about psychological care, but is, um, helpful in this circumstance, the court found that the gatekeepers, um, consultation with a psychologist for psychological issues was insufficient to discharge their gatekeeping responsibilities. And in, um, Mata nurse Weldon, uh, told the inmate come back tomorrow, which essentially if, um, is what happened in come back tomorrow. Someone will see you then that's essentially what happened here. Nurse Johnson understood the need for medical care and, um, at best placed, um, Mr. Krausen in, um, medical holding where he would be under observation the next day and referred him to PA Worlton for a psychological, but not medical evaluation. What about in, uh, in Mata nurse Howell, who, uh, referred Mr. Mata to a nurse practitioner and the panel said that that was, that that was sufficient, that was not deliberately different because she, she did perform her gatekeeping role. She didn't refer to, to, to a doctor, but to a nurse practitioner. So how is it clearly established because you're likening our case to nurse Weldon when the panel reached a contrary nurse Howell. We're not saying that in all circumstances, the gatekeeper needs to refer to a doctor. That's certainly not our position. We're saying that, um, as the court said in Mata, it must be the appropriate medical personnel who's capable of treating the condition. The appropriate medical personnel in this circumstance could have been PA Worlton if the referral had been for medical care, but it was not for medical care. It was for psychological care. And certainly the appropriate medical professional in this circumstance would have been Dr. Leroux himself. The doctor, um, who, uh, uh, is oversees the medical care at this facility. Um, I'll note your honors asked some questions about Monell liability. Um, respectfully, we think that this court lacks jurisdiction over the Monell claim, even if this court finds that it does have jurisdiction over the deliberate indifference claim. And in Quintana, uh, this court explained that, uh, why do we lack jurisdiction? Right. Um, because the, uh, Monell claim is not inextricably interwoven with or subsumed in the qualified immunity claim. And in Quintana, this court said that this court's, uh, jurisprudence holds that there can be Monell liability, even absent, uh, individual liability. And therefore, even if this court were to, um, reverse on the deliberate indifference claims here, and we think it should not, but even if it were to, that still does not, um, leave the district court's Monell, um, analysis. Uh, it's not inconsistent with the district court's Monell analysis here. And for that reason, this court lacks jurisdiction on an interlocutory basis on the Monell claim. All right, counsel, your, your time is up. Does the panel have any further questions? So we'll, we'll turn to a rebuttal time. I'm not sure how you want to divide this up. Uh, that's, that's up to counsel. I'm going to try to reserve 30 seconds for, um, Mr. White here. Um, the, the, the plaintiff is defining qualified immunity at too high a level of generality, and she never gave specifics. If we look at specific facts in Mata and in Sealock, you will have to not only show that the law was not clearly established, but that there's no eighth amendment or 14th amendment violation whatsoever. Um, Renee Huber did not report chest pains to the PA Havens, but she still referred it to PA Havens. And, and therefore she was not deliberately indifferent. Um, nurse Sites faxed a report to a doctor, never talked to him whatsoever, never told him about chest pains, and she wasn't deliberately indifferent. Amy Haught, same thing, reported symptoms to a nurse practitioner, but failed to call the doctor as required by policy. Nurse Quintana failed to call a doctor in violation of policy because she misread an EKG report. Um, nurse Weldon was the only one found, um, liable. She did nothing. See, they said in that case she didn't take vitals. They didn't, she didn't do anything. What we have in this case is nurse Johnson taking vitals every time he saw, um, every time he saw, two times on the 25th. He found in the vitals normal, pupils were dilated, but reactive to medical cell. So he wouldn't put them in a medical cell if he thought there was no medical issue. But I think that's a generic term. Yeah, I thought there was some medical issue going on. So I'm putting him to the medical cell. So he's going to get that observation. That's the assumption under the policy. Does it matter with regard to nurse Johnson in referring him for a psychological evaluation that there's not any specifics? Now, for example, a psychological evaluation can mean a couple of things. He's depressed. Uh, he's experiencing anxiety or he's lethargic and he can't remember where he worked, which is concerned. Honestly, that sounds like a mental health issue very much. So like a psychological evaluation, but I don't think we need a quibble about it. He took action and, and clearly he, a Whirlton as a medical administrator to refer him to Dr. Well, no, my question is actually just the opposite. I'm talking about the urgency of it. And when you say that he took action, actually the absolute opposite is true. He never followed through. Now, maybe he would have followed through if he knew this is really urgent. The man doesn't even know where he worked. He can't remember anything. He's not just lethargic, but he is if he had known that maybe he wouldn't have, uh, you know, neglected to go see him. Yeah. There was no, um, evidence in the record that he didn't know anything. He had no brain function. I think the only evidence was he was lethargic. He had some memory problems. He couldn't remember where he worked before he came to jail on June 11th. He had also been in the hospital for heroin withdrawals. I mean, not heroin overdose. Um, prior to that, I don't think that's that all that, um, alarming. Again, that's a characterization by the district court, but he took action. That's the key. Weldon took no action. He assessed and the assessment came out reasonably okay. He has dilated pupils. That's common if you're withdrawing from something, but they were reactive to light showing that he's not just, you know, totally in some sort of an emergency condition. I'd like to refer the rest of the time if I could to, um, Gary White, if that's Mr. Why? Why don't you take 30 seconds to make your points? Thank you, your honors. Um, I want to go back to the self be crumb case. Um, there's an important quote there about misdiagnosis. Uh, the court there stated that if a doctor faces symptoms that could suggest indigestion or stomach cancer and mistakenly treats indigestion, the doctor, the doctor's state of mind is not established, even if the doctor's medical judgment may have been objectively unreasonable. Uh, your honors, we believe this is a case of misdiagnosis is as it relates to the blood test. It was a medical judgment on Dr LaRose Park not to follow through after it was reported to him that the patient refused the test. He got additional symptoms reported on the 29th and he acted by prescribing medications. We don't believe that's a violation of the Constitution. Thank you. Thank you. Thank you to all council. We appreciate the arguments this morning. Uh, this case shall be submitted and, uh, counselor excused. Thank you.